We'll hear the last case to be argued Universal Instruments versus Microsystems Good morning, and may it please the Court, Amy Saharia of Williams & Connolly for Appellant Universal Instruments Corporation. Cases where a district court grants judgment as a matter of law under Rule 50A and withholds a case from a jury are rare, and there's good reason for that. As this Court has explained, Rule 50 imposes a heavy burden on the moving party to show the absence of a dispute of fact. Now there is one fact in this case that is not in dispute, and that is that defendants, MSCI and MTA, took Universal's source code and used it to make competing versions of Universal's product. But what is in dispute is whether the party's contract authorized that conduct and whether Universal timely sued upon learning of it. And as to those two issues, the evidence was very much in conflict, and the district court erred in deciding the facts for itself. Now let me start, if I may, with the party's contractual arrangements. And I think it's important to emphasize that in the posture in which this case comes to the Court, the Court need only find that there was some ambiguity in the party's arrangement or in the agreement for the jury to resolve to reverse a judgment and send the case for a new trial to a jury. Now the defendants rest their arguments heavily not on the agreement itself, but on the final customer acceptance letter that was signed in 2008, a year after the party's agreement. And I want to emphasize that this case involves two different sets of Universal's source code. This was a line of equipment at which there were various robots or stations, each of which were controlled by their own source code. And then there was a server that kind of orchestrated the entire line and communicated with these various robots. And that server had a separate set of source code. And these are two different source codes. So in 2008, a dispute arose, to be sure, about the server source code and the server source code only. The final customer acceptance letter, by its plain terms, references only the server source code. And MSCI's general manager conceded at trial that that letter governed the server source code. So all of these arguments as to that letter don't apply to the separate set of source code on the various stations. Now, the argument that the district court accepted was that that letter somehow transferred copyright ownership to the server source code. Well, then, do you agree with the statement at page 4 of Judge Sharpe's decision? There is no doubt that Universal provided its source code to MSCI, either pursuant to license in the Equipment Purchase Agreement, Section 82D, or unconditionally as memorialized in the so-called FCA, the Final Customer Acceptance. Do you disagree with that? What I agree with is that Universal provided a copy of the source code to MSCI. But the Copyright Act distinguishes, throughout the Act, between the acts of transferring a copy of a protected work to a third party and copyright. Didn't your own managers and engineers, as pointed out on the same page by Judge Sharpe, that MSCI had a license to use your preexisting intellectual property? They were, according to the decision here, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 of your employees, managers and engineers, who agreed with him? There's no dispute that they had a license to use the preexisting intellectual property. But the question is, what did that license entail, and what did it permit MSCI to do? That license was governed by Section 8.2D of the parties' agreement, and it gave MSCI the limited right to use, reproduce, or display preexisting intellectual property for its internal use only. Why weren't the subsequent uses with MTA internal use? Well, MTA is not internal to MSCI. But it was being used at Microsystems, and they brought in MTA to help. It seems to me it's still internal use. Well, it was provided- The Microsystems wasn't taking this and selling it to someone else. They weren't publishing it to someone else. They weren't distributing. They were doing phases two and three. They did bring in someone outside, and there's a question as to whether that's a servicer or supplier. But why isn't that internal use? Well, for the simple reason that MTA is not internal to MSCI, it is- But MSCI ... I mean, your client knew about the fact that MTA was coming in, and that they were going to bid out that second phase, and it might not go to your client, and did nothing about this for an extended period of time. I mean, they didn't run into court and say, wait a minute, this violates the agreement. That's right, because there's no evidence that our client knew that MSCI was giving its proprietary source code to MTA to complete that project. Until, of course, the final agreement. Well, we weren't privy to the final agreement. No, I'm talking about the last agreement between you and ... when the copy was turned over. Sure, so that final customer acceptance letter, and again, to reiterate- That, coupled with all the fact that they were going to use an outside source or another company to help complete the project, was all that information was known at that time. I respectfully submit that that evidence is not sufficient to say there is no dispute as to whether Universal knew that MSCI was using its source code and giving it to MTA in this way, and for a couple reasons. First of all, again, that letter applies only to the server source code, not as to the station source code. So let's just take the server source code. They knew the server source code was going to be turned over, and that there may be modifications to the source code in order to complete the project, and the second part of the project obviously had to merge or be coextensive with or utilize and be able to marry the first part. Well, that wasn't the evidence at trial. In fact, Universal's CEO testified, and he provided what I would admit is conflicting testimony on this part at JA1303, and then at 1304 he said the opposite. But at JA1303, he said that it would have been Universal's assumption that MTA was not going to use its source code, that the project would have been to mimic the lines that Universal had created, but that Universal would have understood that MTA was going to develop the source code on its own, and I think the best evidence of that is that after... But you might modify the source code to deal with circumstances that come up. I mean, these things aren't... And they got the source code, MSEI got the source code back from your client, and then turned it over to MTA in order to effectuate the completion of the project, and all of that would have been anticipated by your client. It was not anticipated. In fact, our client was surprised when it learned that MTA used its source code, and again, in particular, as to the station source code. Surprised that MSEI had contracted with MTA? No, but surprised that it had given the source code to MTA, and I think the best evidence of that is after MSEI and MTA contracted, MTA came to Universal... But that was the reason why your client was so reluctant to turn over the source code to MSEI, that they knew that the source code would be back in the hands of MSEI, there was further work to be done on the project. Correct me if I'm wrong. Further work to be done on the project, and that if they had the source code, that would be employed and used in the remainder of the work. There is no evidence in the record that at the time of the parties dispute... Why did your client resist turning over the source code? My client never turns over source code. That's not what it does. Why did it resist turning over a copy of the source code? It never turns over copies of source code. Why did it turn over? Well, eventually it did turn over a copy of the source code in 2008. That's what we're talking about. We're talking about that point. That's right, but it did not... It resisted doing that. It did resist doing that, because that's another protection against... We agree on this. We're not arguing about the facts. No.  MSCI told Universal that it was going to give that source code to a competitor to use it to create additional lines. At the very least, the party's contract is ambiguous as to whether that is permitted. You didn't have to tell them. It was obvious to everybody, and that was the reason your client was resisting. It was not obvious, and there's no evidence of that, Your Honor. No evidence as to why your client was resisting? There is evidence as to why my client was resisting, and that evidence is because my client never turns over source code. Mr. Takahashi, didn't he email Lindner, the guy at MSCI, the general manager, and didn't he say, according to the teleconference with your teams and our own ones, it seems we are ready to let you assume ownership of the line? What does that mean? Well, it doesn't mean copyright ownership, because it says absolutely nothing about copyright ownership, and there was testimony in the record that the term ownership of the line is a common term that is used in Universal to mean that once the product is ready to be delivered to the client, the client then becomes responsible for running it. These types of disputes in the fact are exactly what the jury should have been permitted to decide. Again, the evidence is in conflict, and I'll reserve my time for rebuttal. Thank you. Good morning, Your Honors. David Tulchin from Sullivan and Cromwell for Appelli Microsystems Engineering, Inc., MSCI. And with the Court's permission, I propose to take nine minutes of the 12 and allow Mr. Kaplan from Missouri Tooling three. That's fine. Thank you, Your Honor. The District Court's decision to grant the Rule 50 motion was not only correct, but there are several powerful and independent reasons for affirming it. And I want to start first with the provisions of the original 2007 contract, the Equipment Purchase Agreement, EPA. Mr. Harria omits that Section 8.4 says very clearly that for any customized intellectual property, that intellectual property, quote, will be and remain the property of MSCI, Section 8.4. This provision arguably refers to MSCI's property that is then customized. I mean, it seems to me you could read it either way. Well, Your Honor, you can't read Section 8 of Exhibit B that way. I mean, it says the seller is given access to MSCI-owned intellectual property. Yes. And the seller will have such intellectual property created as a result of such customization. So it sounds like it's MSCI's IP that's being customized. Judge Chin, there was no disputed trial that the seller, Universal, was given access. In fact, the specifications for building the test handling system were created by my client, MSCI. The system and the source code that's in question here, it's really the product of joint efforts? Is that clear? The source code was created by Universal from the specifications, the intellectual property provided by MSCI. And the important point here, Your Honor, is — — that it was customized right from the get-go. Yes. And Universal's engineers both conceded this on the witness stand. Kevin Ford, who was responsible for developing the server software, said that he customized it for MSCI. That's at 1668 to 1669. Darrell Evans, who worked on the station software at Universal, said the same thing at 1605 of the joint appendix. So — and I should add Exhibit B, Section 8 of Exhibit B, says the same thing. MSCI owns the IP of the software for anything customized. Now, here's what happened and how we get to the final customer acceptance agreement. Those provisions of the contract were cited by MSCI over and over again to Universal in late 2007 and throughout 2008. MSCI contended that when Universal delivered the system, MSCI would own the intellectual property. And you can see that. Judge Sharpe cited seven exhibits in evidence to support that, and prominent among them are Exhibits 58 and 85, where we said very clearly, for anything you customize, that includes the source code, we're going to own the intellectual property. Not a copy, the intellectual property, i.e., the copyright. Universal disagreed, citing other provisions of the contract, including one that said source code will not be provided, that seemed to conflict with the two that I've mentioned. So what happened? In the final customer acceptance agreement, Universal conceded the point, capitulated. The evidence was un- How do you respond to the argument that this refers only to server source code and not to both source codes or source codes generally? The final customer acceptance does say server source code, because as we pointed out, Judge Chin, in our brief, the station source code had already been turned over, and the testimony on that was undisputed. To get the source code, there was nothing much to it. You just had to attach a cable to the station itself and download it onto your computer. But they had already agreed to give us that. The only remaining- In what? What document shows that they had already given it to you? It's in Exhibit 215, and the testimony of Cordelier, who was the project manager at Universal. Mr. Pellissier, the CEO of Universal, said the same thing at JA 1300. Mr. Evans did at 1612 through 1617. And there was no issue at trial, Your Honor. What about the- so they may have said we gave it to them, but is there something to show that the intellectual property rights were conveyed? Well, what shows it, the station source code was a tiny piece of this case. In the opening statement, in fact, Universal's lawyers said it was the server source code that mattered, that was the brains of the operation, of course. The server is what controls the whole system. But if I could just, Judge Chin, turn for a second to the key thing about the final customer acceptance. The day before, in Exhibit 203, that's at page 2956 of the joint appendix, the draft of the agreement said that the source code ownership issue, ownership, is not resolved. And Mr. Saidi of MSCI and Mr. Caudrillier of Universal agreed on this point in their testimony. Caudrillier is at JA 1545. He said, clear as it can be on cross-examination. I asked him, this was about the issue of source code ownership. And in the final customer acceptance, you gave the source code to MSCI without any restraint or restriction. His answer, that is correct. So, for counsel for Universal to say that this was only about a copy is absolutely wrong. The whole debate over this period of the year was about these provisions in the contract that referred to ownership of the intellectual property for anything customized. That's what the two companies were debating and arguing about. And just to add one final point before I have to sit down, the statute of limitations point here is dispositive in any event. The notice to Universal that there was a dispute about ownership of the intellectual property came more than five years before suit was commenced, with the limitations period being three. Judge Sharp granted the motion on the alternative ground that the statute of limitations bars all the claims. And no matter what you say about the meaning of the final customer acceptance, although Universal's own officer, Caudrillier, agreed with us about what it did, but no matter what you think about that, the claim is clearly barred for being brought too late. Thank you all very much. Thank you. We'll hear from your colleague. Good morning, Your Honor. May it please the Court. Howard Kaplan from Kaplan Rice, and I represent Missouri Tooling and Automation. Missouri Tooling was the supplier of the second and the third test handling system lines. These were awarded in a competitive bidding process where Missouri Tooling and Universal both bid. The documents sent to the bidders very clearly said that MSCI would provide all the software, the server software, the station software, very clearly for these projects. Missouri Tooling won the bid, won both bids, built both projects. We call them the THS-2 and the THS-3. Missouri Tooling received the software from MSCI for these lines and installed them into the lines. That is the sum and substance of what Missouri Tooling did. Mr. Archer, the CEO of Missouri Tooling, testified that he believed that MSCI owned the software in the THS line, because it's customized, it's all customized, and that Missouri Tooling either owned or had a license to reproduce the rest of the line. Mr. Archer specifically testified that the software provided by MSCI was used only for MSCI. Missouri Tooling did not use that software for any other customer or any other projects. And I think, as Your Honor alluded to, the first time Missouri Tooling received a complaint about the use of Universal's intellectual properties was when it got sued in July of 2013. Before that date, there was not a single complaint, a letter, a question from Universal to Missouri Tooling about this issue. And I would add that there was also evidence on conversations directly between Missouri Tooling and Universal in 2010, when the first line was awarded. And I think you've seen some of this about the potential purchase of the Polaris machines. So these two companies were talking to each other for about six months as well. Never raised an issue that Missouri Tooling was going to build a replica of the line and use any intellectual property. I would just want to add one thing here. Mr. Pellissier, who was, I think, the president or the CEO of Universal, testified, this was not confusing, that this was a replication project, and everyone in the industry knows in a replication project, you get the software for it. You get the software from the person who's contracting for that. And that, I'll give you the sites for that. That is, Pellissier is JA-1283 and 1384. Mr. Archer, the CEO of Missouri Tooling, also testified to that, JA-1802. So we submit that the court's pretty clear findings that Missouri Tooling, that there was no evidence that Missouri Tooling did anything with the software other than use it for MSCI. That there was no evidence that MTA was anything other than a subcontractor or supplier here. And that there was no evidence that Missouri Tooling misappropriated any software. And the judge was very clear that it was very, very clear from the record that this software was given to Missouri Tooling, and it was either owned or licensed. And we submit that's very clear from the contract. I have just a few seconds left. I wanted to hit on one subject. You're actually out of time. Oh, I am. You're over by 56 seconds. Oh, I'm sorry. Apologies. I just wanted to just mention preemption. And it probably is too long for just three seconds. But I think it's pretty clear just on the state law claims that they're preempted. And really the only issue that has come up now is a constructive knowledge argument. We'll just rest on our papers. I think the Computer Associates case is very clear on when you get an extra element and when you don't. We don't think that that applies here. Thank you. Thank you. We'll hear the rebuttal. Thank you, Your Honor. For every piece of evidence we just heard, there is substantial evidence to the contrary. And let me give a few examples. First of all, I want to return to the distinction between the station source code and the server source code. The station source code was not a tiny piece of this case. The testimony was that the Polaris stations, these are robots developed by Universal that it sells to many customers, were the guts of the company. And there was substantial testimony about how that intellectual property associated with the station source code was created. There was substantial testimony that the station source code contained vast quantities of preexisting source code that was not customized. I would point the Court to page 1605 of the Joint Appendix where Mr. Evans said that 90% of that source code was the same, was preexisting source code that Universal had used before. What did MTA do with the station source code? I'm sorry, Your Honor? What did MTA do with the station's source code? It received a copy from MSCI. It made some modifications and it used it to build competing versions of Universal's robots. For MSEI? For MSEI, correct. There's no allegation that MTA or MSEI did anything with the source code in terms of going beyond what was actually being used by MSEI? There is no evidence that MTA has used it. They didn't try to sell it or distribute it to anyone else or compete with Universal? There is no evidence of that, Your Honor. I would point the Court to 1748 and 1749, the testimony of Mr. Wolf, about the substantial numbers of preexisting software programs that are Universal's intellectual property that were not customized, that are in that station source code. Are you claiming damages in this case? We are claiming damages. You want a return of the code? Well, we're also seeking an injunction to prevent future use of the code. We're seeking both. How are the damages generated here? Well, we sought various measures of damages. Universal's damages in the form of lost profits from the profits that it did not receive when it was unable to sell its product to MSEI. We sought disgorgement of MTA's profits. Because it didn't win the bidding? Correct. Of course, we may also have statutory damages available to us, and then we sought an injunction. I would urge the Court to look at the MSEI-MTA agreement, which is at page 2426 of the joint appendix, where MSEI itself acknowledged that the Polaris robots, these are the stations, contained Universal's preexisting intellectual property and obligated MTA to keep that confidential. And so the argument that Mr. Tolchin is making now, that MSEI always thought that because they were customized, it owned all of it. And that's what the parties agreed to. Maybe on that portion we fall back on the licensing provision. That's correct. And as to the licensing provision, I would urge the Court to look at section 8.3 of the contract. That provision specifies when MSEI can modify the preexisting intellectual property. It requires it to go get an additional license from Universal in the event that the equipment has been discontinued. There is no evidence the equipment has been discontinued. And importantly, section 8.3 refers to a competitor of Universal, someone that would make the spare parts not as a supplier, but as a third party. And those two terms have different meanings, and those different meanings should be respected. Thank you, Your Honor. Thank you. We'll reserve decision. The remaining cases are on submission. Accordingly, I'll ask the Clerk to adjourn. Thank you, Your Honor. The Court is adjourned.